Estate of Henry T. Sloane, Deceased, John Sloane and Roland L. Redmond, Executors v. Commissioner. *
Estate of Sloane v. Commissioner
Docket No. 108473.
United States Tax Court
1944 Tax Ct. Memo LEXIS 303; 3 T.C.M. (CCH) 358; T.C.M. (RIA) 44114; April 4, 1944
*303 Allin H. Pierce, Esq., 2 Wall St., New York, N. Y., for the petitioners. Thomas H. Lewis, Jr., Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON: Judge: The Commissioner determined a deficiency in estate tax liability in the amount of $3,007,098.15. Petitioners contend that there is no deficiency and that the tax has been overpaid. The estate tax return was filed with the collector for the third district of New York. Several issues raised by the pleadings have been settled by the parties. Effect will be given thereto under Rule 50. The remaining issues fall into three general groups: (1) Issues relating to the fair market values on the optional valuation date of stocks of four closely held corporations; (2) Issues arising out of express reservations by the decedent of interests in 10 inter vivos trusts; and (3) Miscellaneous issues relating to accrued income, additional deductions, and credits for state and Federal estate taxes. General Findings of Fact Henry T. Sloane, the decedent, died testate, a resident of the County and State of New York, on September 18, 1937. His will was admitted to probate by the Surrogate's Court of New York County *304 on October 6, 1937, and letters testamentary were issued to John Sloane and Roland L. Redmond, petitioners, who are the executors of the estate. In the estate tax-return, the petitioners elected that all property included in the gross estate should be valued as of the applicable optional valuation dates provided in section 302 (j) of the Revenue Act of 1926, as amended. The estate tax return was filed on December 17, 1938. I. Value of stocks of C. H. Masland & Sons, W. & J. Sloane, W. & J. Sloane Mfg. Co. and Alexander Smith & Sons Carpet Co. Findings of Fact Among the assets included in the gross estate of the decedent were the following stocks: Item in Return
Class of Stock
Corporation
B-130
362 shares common
C. H. Masland & Sons
B-131
750 shares preferred
C. H. Masland & Sons
B-136
3,175 shares common
W. & J. Sloane
B-137
1,900 shares preferred
W. & J. Sloane
B-138
8,228 shares prior preferred
W. & J. Sloane
B-139
3,020 shares capital
W. & J. Sloane Mfg. Co.
B-140
120 shares capital
Alexander Smith & Sons Carpet Co.
On September 7, 1938, the above stocks were sold, along with other securities owned by the estate, at an auction in New York City conducted *305 by Adrian H. Muller & Son, who are licensed auctioneers. The above stocks were sold to the highest bidder, Wainwright, Luce & Willetts, brokers, who represented John Sloane and Roland L. Redmond, trustees of the testamentary trusts under the will of Henry T. Sloane, who are the same persons as the executors of the estate of Henry T. Sloane, the petitioners in this proceeding. The auctioneer, acting on behalf of the executors of the estate, consummated the sales on September 8, 1938, by delivering negotiable certificates for the above stocks to the purchaser against payment of the sales price. Also, on September 8, 1938, the auctioneer delivered to the executors, petitioners, their check for the net proceeds from the sale after deducting commissions and expenses. Petitioners reported in the estate tax return as the value of each of the above stocks on the optional valuation date the amount of the selling price of each stock at the auction sale less the expenses of the sale. Respondent rejected said values and determined greater values for each stock. The following table shows the values reported and the values determined, respectively: Values returned by
Executors in
Values determined
Estate Tax Return
*by respondent
Approx. Value
Total
Approx. Value
Total
Description of stock
per share *
Value **
per share
Value
362 shs. Masland common
$ 15.00
$ 5,404.66
$ 35.00
$ 12,670.00
750 shs. Masland pfd.
37.50
28,057.50
65.00
48,750.00
3,175 shs. W. & J. Sloane com.
1.30
4,019.53
51.00
161,861.50
1,900 shs. W. & J. Sloane pfd.
5.00
9,367.00
100.00
190,000.00
8,228 shs. W. & J. Sloane prior pfd.
15.25
124,901.04
100.00
822,800.00
3,020 shs. Sloane Mfg.
10.00
29,988.60
60.00
180,587.12
120 shs. Alexander Smith
2,015.00
241,784.40
6,232.00
747,895.45
*306 In August of 1938, the executors of the estate decided to sell at public auction certain bonds and stocks, including those described above, through Adrian H. Muller & Son, licensed auctioneers. That firm was established in 1837; it specializes in auction sales of securities; its sales are held as often as once a week in New Jersey and New York; and its sales have been on behalf of estates, banks, trust companies, agencies of the Federal and state governments. Its sales are held in a public auction room in New York City. The executors instructed Muller to offer the securities in the manner which they advised the executors was best calculated to facilitate bidding and attract persons who wished to bid. At the suggestion of Muller, the executors waived the requirement of a deposit from a bidder representing a firm registered with the New York Stock Exchange or a New York City bank or trust company, who presented a letter of authorization to bid. They authorized Muller to offer the stocks in the group involved herein *307 in lots of 100 shares or multiples thereof with the right to take the entire block, except that the Alexander Smith stock was to be offered in lots of 10 shares or multiples thereof. The securities which the executors directed Muller to sell at auction comprised the stocks listed above, 12 mortgage certificates of Lawyers Mortgage Company having a total face value of about $214,000, a bond and mortgage of Nieberg Realty Co. in the principal amount of $26,000, a debenture bond of 650 Madison Avenue Corporation in the principal amount of $60,000, 195 shares of Master Craftsmen, Inc., 63 shares of Hamilton Homes Ass'n., capital stock, and 20 shares of American Woman's Realty Corporation common stock. The executors directed Muller to insert advertisement of the sale in the New York Times, Sunday, September 4 to Wednesday, September 7, inclusive; and in the New York Herald Tribune and Wall Street Journal, September 5 to 7, inclusive. The advertisements were made, in accordance with the instructions of the above stocks, and they stated that the sales would be auction sales on September 7, 1938, at 12:30 P.M. at 18 Vesey Street by Muller & Son. The advertisements listed all of the above *308 named stocks, bonds, and mortgage certificates. Copies of the advertisements were sent by mail by Muller to about 200 brokers, banks, and individual investors. The executors sent copies of the proof copy of the advertisement of the auction to the principal officers of the companies whose securities were to be sold, and to individuals who would be interested, and to the Guaranty Trust Company, and to several brokerage firms which had indicated some interest. Lists of the announcement of the sale and of the securities to be sold were printed which were avallable before and at the sale. It is the practice for banks and brokers regularly to call at Muller's for announcements of their sales. Sloane and Redmond, in their capacity as trustees of the testamentary trusts, made arrangements to bid for the Sloane, Masland, and Smith stocks. (the group involved here) prior to the auction. With the idea of protecting the executors against the possibility that these securities might go "for a song", the trustees retained a firm of brokers, Wainwright, Luce & Willetts, member of the New York Stock Exchange, and authorized them to make initial and maximum bids on behalf of the trustees. Special *309 instructions were given with respect to the bidding on the stocks involved here. The purpose of the trustees in making such instructions was to avoid the possibility of paying an unduly high price for an entire block of stock where some other bidder desired to purchase only a small number of shares. On September 6, 1938, Redmond gave Wainwright, Luce & Willets the following instructions by letter which stated, in part, as follows: "We are advised that the following stocks will be offered in lots of 100 shares, the successful bidder to have the right to take such part or all of the lot as he may desire. We authorize you to make the following initial and maximum bids in dollars per share for the following securities: Initial
Maximum
bid
bid
"3,175 shs. W. & J. Sloane common
$ 1. $10.
1,900 shs. W. & J. Sloane 6% cum. pfd.
5.
40.
8,228 shs. W. & J. Sloane prior sum. pfd. 6%
10.
50.
3,020 shs. W. & J. Sloane Mfg. Co. com. capital
10.
50.
362 shs. C. H. Masland & Sons
5.
35.
750 shs. C. H. Masland & Sons 5% pfd.
10.
50.
* * * * *
"We are advised that the 120 shares Alexander Smith & Sons Carpet Company, with appurtenant certificate of interest, will be *310 offered in 10 share lots, the successful bidder to have the privilege of taking all or any part of the block and that each share of stock will be accompanied upon delivery by a certificate of interest for $100. We authorize you to make the following bids for this security: Initial bid
Maximum bid $250. per sh.
$3,450. per sh.
* * * * *
"We authorize you to use your discretion in bidding after the initial bid and you may increase any bid made against you by such an amount as you deem appropriate up to the maximum bids above mentioned. You will appreciate that it is our desire to purchase these securities at the lowest possible price. "In the event that you are a successful bidder on the first offering of any of the above mentioned securities we authorize you to elect to take the entire lot unless the amount of your successful bid is in excess of the following prices for the following securities: W. & J. Sloane 6% pfd. $35.
W. & J. Sloane prior pfd.
45.
W. & J. Sloane Mfg. Co. com.
45.
C. H. Masland & Sons
30.
C. H. Masland & Sons 5% pfd.
40.
* * * * *
In such case we would like to have you elect to take only 100 shares of the lot, the balance will *311 then be re-offered and we authorize you to make the same initial and maximum bids. If a second time your successful bid is in excess of the figures last mentioned, we authorize you to again elect to take only 100 shares. Upon the next offering we would like to have you stop bidding at the figures last mentioned above so that the other person bidding against you may become the successful bidder and be in a position to elect to take the amount of stock which he desires. If he should elect to take less than the balance then offered, we authorize you upon the next offering to again bid the original initial and maximum bids mentioned above. It is our thought that this method will prevent us paying an unduly high price for an entire block when some competitor may desire to have only a small part of it. "These bids are made on behalf of Mr. Sloane and myself as trustees under the Thirteenth Article of Mr. Sloane's will, a copy of which we enclose for your information. * * *" The letter also authorized the brokers to make initial and maximum bids on securities of Lawyers Mortgage Co. and certain bonds. The auction sale was held on September 7, 1938, and all of the securities offered were *312 sold for a gross amount of $554,851. Advertising, commissions, fees, and stamps came to $2,672, so that the net proceeds were $552,179. More than 100 persons attended the sale. Sloane and Redmond attended the sale. They were present to vary their instructions, as trustees, to their agents if they believed circumstances required altering the instructions. At the auction, the auctioneer read the terms of the sale, announced that the certificates for the securities were present for examination, explained that certain stocks could be purchased either as a block or in lots of 100 shares or 10 shares, as the case might be, and then called for bids. At the conclusion of the bidding on each item, the auctioneer announced the sale and inquired how many shares the successful bidder wanted. For some securities there was active bidding; for some there was only a single bid. Wainwright, Luce & Willetts, representing the trustees, were the successful bidders for all of the stocks involved in this proceeding and for 195 shares of Master Craftsmen, Inc., and the bond and mortgage of the Nieberg Realty Co. In their letter to Wainwright, Luce & Willetts, dated September 6, 1938, part of which has *313 been quoted above, the trustees authorized Wainwright, Luce & Willetts to bid on every stock, bond, and mortgage certificate offered at the auction except shares of stock in American Woman's Realty and Hamilton Homes Ass'n; and the trustees stated the amounts of the initial and maximum bids which their agents were to make for each security, as in the instance of the stocks in question. In every instance where the successful bidder was some firm or person other than Wainwright, Luce & Willetts, the bid exceeded the amount of the maximum bid authorized by the trustees except in two instances where the agents of the trustees did not bid the maximum and the security went to someone who took at a price equal to the authorized maximum bid. In addition to Wainwright, Luce & Willetts, there were 12 purchasers of the several securities offered. The following table shows the number of bids and the sales price for the group of stocks here involved: No. of
Sales Price
Securities Sold to the Trustees
Bids
Per Share
Per Block
362 shares Masland common
36
$ 15.00
$ 5,430
750 shares Masland preferred
79
37.50
28,125
3,175 shares W. & J. Sloane common
2
1.30
4,127
1,900 shares W. & J. Sloane preferred
1
5.00
9,500
8,228 shares W. & J. Sloane prior pfd.
19
15.25
125,477
3,020 shares Sloane Mfg. capital
1
10.00
30,200
120 shares Alexander Smith capital
17
2,015.00
241,800
Total
$444,659
*314 The bidding was as follows: The bid for Masland common started at $5 a share and, after 36 bids, the stock was sold for $15 a share. The bid for Masland preferred started at $11 per share and, after 79 bids, the stock was sold for $37.50. There were two bids for the Sloane common, an initial bid of $1, a second bid of $1.25, and a last bid of $1.30. There was only one bid of $5 for Sloane preferred. On Sloane prior preferred, the bidding started at $10, and went gradually up to $15.25 after 19 bids. There was only one bid of $10 a share for Sloane Manufacturing. On the Alexander Smith stock, the bidding started at $250 a share, and went to $1,000, $1,050, $1,150, $1,500, $1,550, $1,600, $1,625, $1,700, $1,725, $1,800, $1,825, $1,900, $1,925, $1,975, $2,000, $2,010, and to $2,015. The optional valuation date of the Masland, Sloane, and Smith stocks is September 8, 1938, for the purpose of determining the estate tax liability in this proceeding. C. H. Masland & Sons is a corporation engaged in the manufacture of carpets and rugs. It was incorporated in 1907 under the laws of Pennsylvania. In 1938, its issued and outstanding stock consisted of 14,432 shares of common stock and 6,250 *315 shares of 5 percent non-cumulative preferred stock, both having a par value of $100 a share. In 1938, approximately 78 percent of the stock was held by members of the Masland family, and the remainder was held by members of the family of the decedent, by the estate of the decedent, and by persons associated with W. & J. Sloane. There were 69 holders of the common and 27 holders of the preferred stocks. From 1889 until November, 1938, W. & J. Sloane acted as the sales agent of Masland & Sons. Neither of the Masland stocks was listed on any exchange and very few shares have been bought and sold. During the ten years 1929 to 1938, inclusive, the Masland business was operated at a loss in 1930, 1931, 1932, 1934, and 1938, and at a profit in the other years. The total of the annual losses during the above years was $893,000; the total of profits in the other years was $376,000. No dividend was paid on the common stock during any of the years 1927 to 1940, inclusive. No dividend was paid on the preferred stock during 1929 to 1938, inclusive, except in 1937 when a dividend of $5 was paid, partly in cash and partly in notes. The fair market values on September 8, 1938, the optional valuation *316 date, of the Masland stocks were as follows: $16 per share for the 362 shares of common stock; $37.50 per share for the 750 shares of preferred stock. W. & J. Sloane, hereinafter referred to as the Sloane Company, is a New York corporation, organized in 1891. The business of the company included the retailing of furniture, floor coverings, and household furnishings; the wholesaling of rugs, carpets, and linoleum; the supplying of furnishings for hotels, steamships, and other large establishments under special contracts. The principal place of business is in New York City. Branch stores are maintained in San Francisco and Beverly Hills, California, Washington, D.C., and New York City. In 1938, the Sloane Company controlled through ownership of blocks of stock, W. & J. Sloane Manufacturing Company, Inc., a manufacturer of furniture, and the William John Corporation, which owned a warehouse in New York which was used by the Sloane Company. Until November 1938, the Sloane Company acted as wholesale selling agent for Alexander Smith and Sons Carpet Company, C. H. Masland and Sons, and Sloane-Blabon Corporation. The Sloane-Blabon Corporation manufactured linoleum. All of its stock was *317 owned by W. & J. Sloane Manufacturing Company, a non-operating company. In 1938, the capitalization and outstanding stock of the Sloane Company was as follows: 18,046.2 shares - 6% prior preferred stock, par value $100 40,000 shares - 6% preferred stock, par value $100 59,547 shares - common stock, par value $10 (there were also 453 shares of common stock held in the treasury) The prior preferred stock had a prior claim to assets and to dividends. It had no voting rights under any circumstances, it was callable at $102 per share, and it was convertible into common stock. The preferred stock was junior to the prior preferred in its claim to assets and dividends. It had no voting rights. It was callable at $106 per share. The prior preferred stock had dividend arrears equal to approximately $515,000 ($28.50 per share) in September 1938. The preferred stock had dividend arrears of $1,280,000 ( $32 per share). The common stock had sole voting rights. The Sloane family has always controlled the Sloane Company. In 1938, all of the prior preferred stock was owned by members of the Sloane family; 75 per cent of the preferred stock was owned by members of the Sloane family or by their *318 estates or trusts. The remaining 25 percent of the preferred stock was owned by heirs of former members of the Sloane family, by stockholders of Alexander Smith and Sons Carpet Company, and a few shares were owned by the public. Members of the Sloane family owned 55 per cent of the common stock; the Smith Company and its associations owned 25 per cent of the common stock; and 20 per cent was owned by executives and salesmen employed by the Sloane Company. In 1938, there were approximately 40 holders of the prior preferred stock, 50 holders of the preferred, and 110 holders of the common stock. None of the stocks of the Sloane Company have ever been listed on any stock exchange. During 1937, the Sloane Company sold 500 shares of common stock, which was held in the treasury, at $10 per share. On December 29, 1938, an officer and director of the Sloane Company sold 200 shares of common stock at $1.45 per share to individuals who were business associates. He sold the stock in order to establish a tax loss. Except for the sale of common stock at the auction on September 7, 1938, there is no evidence of any other sales of the Sloane Company common stock during the years 1937 and 1938. In *319 1933, there was a recapitalization of the Sloane Company and new prior preferred stock, having a par value of $100, was created. In November of 1933, 2,000 shares of new prior preferred stock were sold to members of the Sloane family for cash at par. Except for this sale and the sale of the prior preferred stock at auction on September 7, 1938, there is no evidence of any sales of the prior preferred stock. Except for the auction sale of preferred stock there is no evidence of any other sales of preferred stock. No dividends were declared or paid on any class of the Sloane Company stock from the date of recapitalization in 1933 to 1938, inclusive. The Sloane Company had been a prosperous concern until 1929, due in large part to the profits obtained through its sole selling agency of carpet and linoleum mills. The business suffered during the depression. After 1929, and from 1930 through 1934, the business operated at a loss during each year. The losses were as follows: In 1930, the Sloane Company operated at a loss of $1,063,000; 1931, $1,975,000; 1932, $2,618,000; 1933, $555,000; 1934, $582,000. As of December 31, 1932, the earned surplus account of the company showed a deficit *320 of $3,631,000. During the depression period, members of the Sloane family made large advances to the business. In 1933, under a plan of recapitalization, the par value of the common stock was reduced from $100 a share to $10 a share and the amount of the reduction was transferred to capital surplus. The new 6 percent prior preferred stock was issued to discharge debts due to stockholders for advances, to pay accrued preferred stock dividends, and to obtain cash. On or about December 1, 1933, the wholesale business was segregated from the retail business and was turned over to a newly organized corporation, W. & J. Sloane Selling Agents, Inc., which acquired the assets and assumed the liabilities of the wholesale department and carried on the business as a wholly owned subsidiary of the Sloane Company. The segregation was made at the suggestion of the Alexander Smith Company which felt that its accounts receivable for products sold by the Sloane Company should not be mingled with the Sloane Company business and should be better secured. The Sloane Selling Agents Company continued in business until 1935 at which time it was merged into the Sloane Company, although the segregation of *321 accounts continued. During 1938, and prior, the Sloane Company borrowed heavily from banks, and from 1932 through 1938, the Sloane Company was unable to pay its bills with sufficient promptness to obtain cash discounts. On January 1, 1938, the Chase National Bank of New York held notes of the Sloane Company aggregating approximately $774,000, which indebtedness was reduced to $474,000 at the end of 1938. The Chase Bank held collateral to secure the indebtedness having an aggregate book value of approximately $3,487,000 plus an agreement which provided that one-half of the 1938 cash profits of the wholesale division should be paid to the bank. In the early part of 1938 a decision was made by the Alexander Smith Company that there would be no renewal of the selling agency contract held by Sloane, which was due to expire by its terms on November 1, 1938. On August 3, 1938, an agreement was executed by the two companies under which the Smith Company was to take over the sale of its own products and also the sale of the products of C. H. Masland and Sons. The arrangement under this contract resulted in the Sloane-Blabon Corporation also taking over the sale of its own products. As a result, *322 the Sloane Company's wholesale business was practically eliminated under the above agreement. The fair market values on September 8, 1938, of the Sloane Company's stocks were as follows: For the 3, 175 shares of common stock, the fair market value was $1.30 per share; for the 1,900 shares of preferred stock, the value $5was per share; for the 8,228 shares of prior preferred stock, the value was $30.00 per share. The W. & J. Sloane Manufacturing Company was organized in 1924 under the laws of New Jersey. It was organized by the Sloane Company to manufacture linoleum and other forms of floor covering. In 1925, it built a plant in Trenton, New Jersey. In 1931, its operating assets were consolidated with those of two other linoleum manufacturers, George W. Blabon and Company and the floor covering division of Certain-teed Products Corporation, to form Sloane-Blabon Corporation. As a result of this merger, Sloane Manufacturing Company became a holding company, and thereafter, practically its only assets were shares of the stock of Sloane-Blabon Corporation. In 1937 and 1938, Sloane Manufacturing Company owned 18,309 shares of the class A preferred stock, 5,435 shares of the class B preferred *323 stock, and 32,513 shares of the common stock of Sloane-Blabon Corporation. The total outstanding capital stock of the Sloane-Blabon Corporation consisted of 24,208 shares of class A preferred stock, 15,027 shares of class B preferred stock, and 75,633 shares of common stock. Except for a nominal amount of common stock, all of the shares of all classes of stock not owned by the Sloane Manufacturing Company were owned by Certain-teed Products Corporation. In 1938, the outstanding stock of Sloane Manufacturing Company consisted of 60,000 shares of capital stock, par value $100, 26,411 shares of the capital stock were owned by the W. & J. Sloane Company; 10,000 shares were owned by the Alexander Smith Company; and the remainder of the capital stock was owned by 108 stockholders who were either members of the Sloane family or employees of the Sloane Company or the Smith Company. There were, in all, 110 stockholders. During the years 1934 to 1938, inclusive, the Sloane Manufacturing Company received no dividends on the Sloane-Blabon stock which it owned and had no income whatever. Its annual net losses ranged from approximately $3,000 in 1934 to approximately $6,000 in 1938. In the summer *324 of 1938, it was decided that the Sloane Manufacturing Company should be dissolved, and by September of 1938 all essential steps for the dissolution had been taken. The dissolution was effected in February of 1939. Upon the dissolution, the owners of Sloane Manufacturing Company stock received, in exchange, stock of the Sloane-Blabon Corporation at a certain ratio for the various classes of the Sloane-Blabon stock. As a result of the distribution in 1939, the Sloane Company, in exchange for its 26,411 shares of Sloane Manufacturing Company stock, received stock of Sloane-Blabon Corporation as follows: 7,922 shares of class A preferred, 2,114 shares of class B preferred, and 13,209 shares of common stock. In exchange for the 3,020 shares of the Sloane Manufacturing Company stock owned by the estate of decedent, the estate received stock of the Soane-Blabon Corporation as follows: 904 shares of class A preferred, 244 shares of class B preferred, and 1,512 shares of common stock. The stock of the Sloane Manufacturing Company was never listed on any stock exchange. Except for the sale at the auction on September 7, 1938, there is no evidence of sales of stock of this company. On December *325 31, 1937, the accumulated undeclared dividends on the class A preferred stock of Sloane-Blabon Corporation amounted to $27 per share, and, on the class B preferred stock amounted to $22.50 per share. On December 31, 1938, the accumulations were $33 and $27.50 per share, respectively. The management of Sloane-Blabon Corporation was controlled by Certainteed Products Corporation. In 1938, the board of directors consisted of 4 representatives of Sloane Manufacturing Company and 5 representatives of Certain-teed. The fair maket value of 3,020 shares of W. & J. Sloane Manufacturing Company capital stock on September 8, 1938, was $28 a share. Alexander Smith and Sons Carpet Company is a New York corporation which was organized in 1873. Its offices and mills are in Yonkers, New York. It is the oldest and one of the best known concerns in the wool carpet and rug industry in the United States. At the time of organization, the corporation issued 3,000 shares of capital stock, par value $100 per share, and shortly after, the board of trustees directed that there also be issued scrip certificates in the aggregate amount of $300,000. Each certificate of stock was to be accompanied by a certificate *326 of scrip having a face value equal to the par value of the stock; and the scrip was to be transferrable only with an equivalent amount of stock. None of the scrip has ever been called for payment and the capital structure as thus established has remained unchanged. Scrip certificates still accompany the stock certificates and are generally regarded as certificates of paid-in or capital surplus. The scrip has never participated in any distribution of earnings. The 120 shares of stock involved in this proceeding are accompanied by scrip certificates. In 1937 and 1938 the outstanding stock of the Smith Company consisted of 3,000 shares of capital stock and 3,000 scrip certificates. In 1938, the members of the family of Alexander Smith owned about 75 percent of the stock and scrip; the Sloane family and the Law family owned about 15 percent; and about 10 percent of the stock was owned by present or former executives of the Smith Company. The stock has never been listed on any stock exchange and there have been very few transfers of stock other than those resulting from death. There were only three sales of stock of the Alexander Smith and Sons Carpet Company during the period 1933 to *327 1938, inclusive. In April of 1933, 39 shares were sold at $1,282.50 per share. In December of 1937, 10 shares were sold at $2,500 per share. On September 28, 1938, 3 shares were sold at $2,000 per share. The only other sale was the sale at auction on September 7, 1938, involving the 120 shares held by the executors of the estate of the decedent. The net profits and dividends paid in 1935 to 1938, inclusive, were as follows: Dividends
Year
Net Profits
Paid per Share
1935
$849.002 $100
1936
898,201
200
1937
562,402
250
1938
21,278
In 1928 the Smith Company entered into a contract with W. & J. Sloane, under which the latter became exclusive sales agent for the Smith products for a ten year period ending on November 1, 1938. During the last six years of this contract the Smith Company repeatedly expressed doubt as to the solvency of W. & J. Sloane, and in 1932 it caused the contract to be amended so as to provide greater security for its accounts. In the early part of 1938, the Smith Company decided not to renew the contract; and, under an agreement dated August 3, 1938, it assumed the sale of its own products and took over the sales offices and personnel of *328 Sloane's wholesale division. There was considerable doubt as to what effect this change would have upon the Smith business. For ten years the company had been out of the sales market; it had no direct representatives in the trade; and there was uncertainty as to how its position as dealer could be reestablished. The balance sheet of Alexander Smith & Sons Carpet Company as of December 31, 1938, was as follows: Assets
Current Assets: Cash
$ 563,844
Federal, State and City Bonds
154,162
Accounts Receivable
2,806,200
Inventories
7,673,300
Total
$11,197,506
Investment - W. & J. Sloane Mfg.
Co.
601,400
Trademarks and Patents
1
Other Assets
791,068
Land and Buildings
$17,031,617
Less: Reserve for De-
preciation
9,517,652
7,513,965
Total Assets
$20,103,940
Liabilities
Current Liabilities: Trade Acceptances and Commis-
sions Payable
$ 823,021
Accrued Taxes
325,481
Other Accrued Items
215,487
Total
$ 1,363,989
Miscellaneous Reserves
15,000
Capital Stock - 3,000
shares
$ 300,000
Scrip Certificates (re-
deemable at par; not
entitled to interest or
diivdends)
300,000
Surplus
18,124,951
18,724,951
Total Liabilities
$20,103,940
*329 On September 8, 1938, the fair market value of 120 shares of Alexander Smith & Sons capital stock was $2,600 per share. Opinion Petitioners, in the estate tax return for the estate of the decedent, reported the prices per share for which the securities in question were sold at auction as the fair market value of each stock, respectively; and they took the date of the sale, September 8, 1938, as the optional valuation date. Respondent does not agree that the sales of the stocks to the trustees are determinative of the question, but he does agree that title to the stocks was transferred by the executors to the trustees on September 8, 1938, and that such date is the "optional valuation date", whether the transfers were accomplished by sale, by distribution, or by some other disposition. See section 302 of the Revenue Act of 1926, as amended by section 202 of the Revenue Act of 1935. There is no question relating to the optional valuation date under this issue. The only question under this issue relates to the determination of the fair market value of each lot of stock on September 8, 1938. At the hearing, respondent did not attempt to support the values which he determined originally. *330 He did not call any witnesses. His only evidence consisted of accountants' reports and pages from Moody's and Poor's manuals. On brief, respondent contends that the finding of fact of the fair market value, in each instance should be as follows: 362 shares Masland Common
$ 35 per share
750 shares Masland preferred
50 per share
3,175 shares W. & J. Sloane common
10 per share
1,900 shares W. & J. Sloane preferred
40 per share
8,228 shares W. & J. Sloane prior preferred
50 per share
3,020 shares Sloane Mfg. Co., capital
50 per share
120 shares Alexander Smith Co., capital
3,450 per share The above values are the maximum bid prices authorized by the trustees for the purpose of the bidding by their agent at the auction sale. It is to be noted here that none of the above maximum bids were made at the auction sale. In determining the values of the stocks in question, as shown in the statement attached to the notice of deficiency, respondent determined that the fair market value of Masland common was $35 per share; and that the value of Masland preferred was $65 per share. He states that those values represented the mean between the low and high quoted prices "as of the optional *331 valuation date". The record is silent as to the source of the alleged quoted prices and as to the amounts of any such quoted prices. There is no evidence of any market quotations or of any quoted prices for these stocks at any time close to the optional valuation date, the only evidence of any sale or prices being the auction sales. Also, in the statement attached to the notice of deficiency, respondent stated that the values which he determined for the other stocks represented the fair market values as disclosed by the balance sheets and financial statements of the several corporations. It is shown in the findings of fact that the value per share so determined for each stock was $51 per share for Sloane common; $100 per share for Sloane preferred; $100 per share for Sloane prior preferred; $60 for Sloane Manufacturing; and $6,232 per share for Alexander Smith Carpet Company. It is readily seen that there are wide differences between the values for each stock as originally determined by the respondent and as now contended for by him, except in the case of Sloane Manufacturing Company capital stock. Petitioners rely upon the auction sales as the best evidence of the fair market value *332 of each stock and ask that the finding of fact upon the value, in each instance, should be the selling price per share for each lot of stock at the auction. However, petitioners introduced opinion evidence of two experts; Paul B. Coffman, vice president of Standard & Poor's Corporation, in charge of research and valuation; and Robert G. Wiese, a member of the firm of Scudder, Stevens & Clark, investment counsellors. Coffman did not express any opinion of the value of the Masland stocks. In the opinion of these witnesses, the stocks in question had the following values as of the optional valuation date: Coffman
Wiese
362 shares Masland common
$ 16.00
750 shares Masland preferred
26.00
3,175 shares W. & J. Sloane
common
$ 1
2.50
1,900 shares W. & J. Sloane
preferred
5
11.00
8,228 shares W. & J. Sloane
prior pfd.
26
33.00
3,020 shares Sloane Mfg. Co.
28
18.17
120 shares Alexander Smith
Co.
2,600
2,620.00
We have considered all of the evidence. The determination of the fair market values of each of the stocks is difficult because in each instance there was not an established market for any of the stocks. Also, each corporation was a family corporation, the *333 stock of which was closely held. The lots of stock held by the estate of the decedent were small and represented only minority interests. There had been very few sales of any of the stock. The two witnesses for petitioner used different methods in arriving at their opinions of value. Wiese considered the financial condition of each company, the earnings record for past years, and the outlook for earnings in the future. However, in each instance, he selected securities of businesses in a similar condition with respect to earnings, and considered the market values of the securities of corporations which he selected as comparable. He then applied a discount factor where the stock here in question appeared to be of less value than the best comparison he found. After arriving at a preliminary value for the stock in question, he tested such value by further comparison of the asset values of the stock in question and the comparative stocks. He also made comparisons of the stock in question at his tested valuation, with the market prices of selected comparable stocks which were listed on the New York Stock Exchange. His method of valuation can best be described as an attempt to calculate *334 what the market price of each of the stocks in question would be if there were an established market for each stock by making comparisons with concerns whose stocks were bought and sold on a market. His method also seems to represent one which an investment counselor would use in giving advice to clients in search of investments, having a wide choice of securities to choose from. His method gave little if any consideration to what a willing buyer and a willing seller would agree upon as the fair price of any one of the particular stocks in question, each having a reasonable knowledge of the material facts relating to the corporation and its business at the date of valuation. See Mathilde B. Hooper, Administratrix, 41 B.T.A. 114, 129, for a discussion of the material factors to be considered in determining the fair market value of the stock of a close corporation. The opinions of Wiese gave too little consideration to the material facts relating to each corporation whose stock was to be valued. Setting aside for the moment consideration of the weight to be given the auction sales, and Wiese did not give them any weight but proceeded as though there were *335 no sales in an open market of any of the stocks, we refer to our prior expressions of doubt of the probative value of such type of expert testimony. See Estate of Jacob Fish, 1 B.T.A. 882, 886, where we said, "Such computations are too speculative to form the basis for the levying and collecting of taxes". See also, George D. Harter Bank, Executor, 38 B.T.A. 387, 398; and James Couzens, 11 B.T.A. 1040, 1163, where comment is made regarding opinions of value which apply considerations applicable to a freely marketable listed stock. We consider the opinions of Wiese as weakened by the method he followed; but we have given consideration to his opinions. Coffman gave consideration to the following factors in his valuation of all of the stocks except the Masland stocks, which he did not value: Book value [n1] (which he did not consider a reliable guide), earnings, past, current, and estimated future. He considered the particular business in which each corporation was engaged, internal conditions in the particular business, and conditions outside of the business and beyond its control but which *336 have a bearing upon the conduct of the business. He endeavored to arrive at a reasonable estimate of earnings and dividend paying capacity over a reasonable period in the future. In each instance he considered the asset position of the company as shown by its balance sheet as of December 31, 1938, and he reviewed the balance sheets for the four preceding years. He analyzed the record of the income account over the period 1934 to 1938, inclusive. Some of his observations with respect to each corporation which he valued are set forth below: (a) W. & J. Sloane Coffman found that during the years 1934-1938, both inclusive, the wholesale division contributed more than three-quarters of the total net sales of the company. In 1938, 74.1 percent of the total net sales were from the wholesale department, and in earlier years, 79 percent. The wholesale division had operated at a profit during the above period. He found also that during the five year period of his test period, the company operated at a sizable net loss, if the wholesale division were excluded. It was decided in August of 1938 that the Smith Company would not renew its agency agreement with Sloane, and that Smith would *337 take over other selling activities of Sloane, so that its wholesale business would be entirely eliminated. Accordingly, Coffman considered the future prospects on the basis of the record of the retail department. The retail department had operated at net losses ranging from $134,000 to $594,000 during the five year period, except in 1937 when the net profit was $23,000. He estimated that the company could be expected to show a net loss from operations over a reasonable period in the future, and that it would not be in a position to declare dividends even on its prior preferred stock, let alone the preferred and common. The Sloane Company had paid no dividends from 1934 to 1938, inclusive. He was unable to base his values for the Sloane stocks on earning power and dividend paying capacity. He did not consider liquidation value a sound approach. He treated the problem as one relating to a going concern. He resorted, finally, as the only method to value the stock, to analyzing the market prices of industrial non-dividend paying preferred stocks in relation to their par value plus accumulated dividends, to obtain the percentage relationship of market prices to par plus accumulated dividends. *338 He determined, by comparison, that a ratio of 20 percent to par would be fair for the prior preferred stock of Sloane, and applying such ratio to par plus accumulated dividends, $130 per share, he found $26 per share to be the fair market value of the prior preferred stock. The prior preferred stock had preference as to assets and dividends over the preferred and common stocks. In his opinion there was very little value applicable to the preferred and common shares. Because of the relative position of the preferred stock and the voting rights held by the common stock he arbitrarily placed a value of $5 per share on the preferred stock, and $1 per share on the common. (b) Sloane Manufacturing Company The Manufacturing Company was a holding company. It had received no dividends from its holdings of Sloane-Blabon stock during the period 1934-1938. In the summer of 1938 it had been decided to dissolve the company and to distribute the assets to the stockholders. Coffman determined a fair value of the Sloane-Blabon stocks upon a consideration of the prospective earning capacity of that company and its ability to pay dividends. On December 31, 1938, there were arrears on the Sloane-Blabon *339 stocks of $33 per share on the class A preferred stock, and $27.50 per share on the class B preferred stock. That was considered. By a method of capitalizing the prospective dividends on these stocks, and discounting them for a period of three years to allow for liquidation of bank loans, and valuing the arrearages in dividends, he valued the class A stock at $85.60 per share and the class B stock at $21.08 per share on September 8, 1938. For the common stock there was no prospect of dividends for an extended period. A value of $2 per share was placed on this stock. On the basis of the fair market values of all of the Sloane-Blabon stocks, Coffman determined that the fair market value on the optional date of Sloane Manufacturing stock was $28 per share. (c) Alexander Smith & Sons Carpet Co. In valuing the Alexander Smith stock, Coffman considered the same factors as in the case of the other stocks. This company had a net working capital at the end of 1938 of $9,833,517, and surplus of $18,124,951. The book value of its stock was $6,141.32 per share, excluding the 3,000 scrip certificates which are redeemable at par but not entitled to interest or dividends. During the period *340 1934-1938, Coffman found that net sales and net income were as follows: Year Ended
Dec. 31
Net Sales
Net Income
1934
$ 7,769,725
$142,738
1935
12,630,962
849,002
1936
17,139,136
898,201
1937
18,823,800
562,402
1938
13,997,088
21,278 He considered past earnings and estimated future earnings, giving consideration to the new selling agreement which called for 6 percent commissions on sales for the Masland Company; and the company's past record of dividend payments. The past experience of the company showed a flexible policy of paying out a substantial portion of earnings in dividends in profitable years. He estimated that the company could pay, in the future, 75 percent of its projected net income, which would indicate future dividends of $175 per share. He used the rate of 6.75 percent to capitalize the estimated future dividends which yielded $2,592.59 per share. In his opinion, the fair market value of the Alexander Smith stock was $2,600 per share on September 8, 1938. Due consideration has been given to Coffman's testimony and opinions of value. Respondent contends that the values expressed by both witnesses are not entitled to much weight. He argues that *341 the values are too low when compared with the net worth of each company as shown by the balance sheets. Respondent contends, also, that the sales on September 7, 1938, at the public auction are not conclusive evidence of the fair market values of the stocks. Respondent points out that the executors and the trustees were the same individuals, and that one of them, John Sloane, was an officer in the Sloane Company, and was well acquainted with the business. John Sloane had been president of the company; he was a director and chairman of the board; and he had been in the business since 1906. Respondent argues that the prices determined by the trustees as the prices at which the stocks might be sold to outsiders (the maximum bid prices), represent their opinion of the values of the stocks and that such opinion is more reliable than that of the experts who were not as intimately acquainted with the business of each company. Upon consideration of all of the evidence we have found the fair market value of each stock on September 8, 1938, to be the prices set forth in the findings of fact. The prices obtained at the auction sales are not the only criteria to use in making the determination *342 of the fair market values. The vendors and the vendees were the same persons and it was the intent of Sloane and Redmond to have their agents bid prices above the bid of any outsiders up to the maximum prices which they set. They were present at the sale to alter their instructions to their agents. There was, accordingly, such control of the auction sales by the principals that they cannot be regarded as arms-length sales in every instance. In reality, the executors were selling to themselves. On the other hand, we do not regard the maximum authorized bids as determinative of the fair market values. At best they represent only further opinions of value. Although these maximum bid prices were fixed by Sloane and Redmond in their capacity as trustees, as the top prices they were willing to pay as vendees, those prices must be regarded also as the prices for which the executors were willing to sell the stocks in an arms-length transaction. At the auction sale no outsiders were willing to pay prices which reached the level of the prices at which the vendors were willing to sell. Accordingly, the maximum authorized bids were not indicative of fair market value. There was practically no *343 market for the stocks. The vendors were not "willing sellers" at the low prices which the limited market of the auction room provided. They sold the stocks to themselves in their capacity as trustees rather than sell to outsiders at the low prices offered at the auction. The net effect of the situation is that there was no any agreement upon a sales price between willing buyers and willing sellers at the auction sale. When the market did not rise to the prices at which the vendors were willing to sell, the vendors took the stocks themselves in their alter ego capacity, at a bid priced slightly above the offers which were made. The auction sale served no purpose other than to effect a distribution and transfer of the stocks to the trustees. Except for this, the auction sale was a mere formality. Or, if the auction sales be given the character as sales in a limited market, then we think the prices obtained were, in almost every instance, too low, in relation to intrinsic value, to be the sole criterion of fair market value. William Korn, Executor, 35 B.T.A. 1071, 1078; Eleanor Lansburgh, Administratrix, 35 B.T.A. 928, 935. *344 Consideration has been given to all of the evidence, including the opinions of the two experts and the auction sales. We have found as a fact that the fair market values of the stocks in question on September 8, 1938, were as follows: 362 shares of Masland common
$ 16.00 per share
750 shares of Masland preferred
37.50 per share
3,175 shares of W. & J. Sloane common
1.30 per share
1,900 shares of W. & J. Sloane preferred
5.00 per share
8,228 shares of W. & J. Sloane prior pfd.
30.00 per share
3,020 shares of Sloane Mfg. capital
28.00 per share
120 shares of Alexander Smith Co. capital
2,600.00 per share These amounts, in our opinion, represent the lowest figure that a willing buyer and a willing seller would agree upon on September 8, 1938, each having a knowledge of the facts. These amounts reflect the trend of earnings and reasonable prospects for the future. II. Inter Vivos Trusts Findings of Fact Henry T. Sloane, the decedent, was born on December 1, 1845, and at the date of his death on September 18, 1937, he was 92 years of age, reckoned to his nearest birthday. On the date of his death there were two living children surviving the decedent, Jessie Sloane *345 Widener and Emily Sloane de La Grange. There were living also, Diana Dodge Ryan, daughter of Jessie Widener; and Diana and Alexandra Davies, daughters of Diana Dodge Ryan; and four children of Emily de La Grange, Amicie, Anne, Emillie, and Henry. The relationship to decedent, the date of birth, and the age of each on September 18, 1937, the date of the decedent's death, for all of these direct living descendants of the decedent are set forth below: Age on 9/18/37
Relationship
Date of
Nearest
Name
to Decedent
Birth
Birthday
Jessie Sloane (Dodge) Widener
Daughter
Dec. 16, 1883
54
Diana Dodge (Davies) Ryan
Granddaughter
Aug. 20, 1910
27
Diana Davies
Great granddaughter
Sept. 3, 1931
6
Alexandra Davies
Great granddaughter
Jan. 6, 1934
4
Emily E. Sloane de La Grange
Daughter
Jan. 28, 1890
48
Amicie H. E. de La Grange
Granddaughter
Jan. 21, 1917
21
Anne Odette C. de La Grange
Granddaughter
Apr. 27, 1918
19
Emillie L. M. de La Grange
Granddaughter
Mar. 30, 1919
18
Henry L. E. A. de La Grange
Grandson
May 25, 1924
13
In the years 1916 to 1924, inclusive, the decedent created ten trusts and transferred property to the trustee *346 or trustees under the trusts. The parties are agreed that none of the transfers in trust were made by the decedent in contemplation of death. The terms of each of the ten trusts are incorporated herein by reference. The trusts were created for the following named beneficiaries: Number of
Age on
Date of Creation
Trust *
Named Beneficiary
9/18/37
of Trust
Trust No. 9
Jessie Widener
54
June 8, 1921
Trust No. 1
Diana Dodge Ryan
27
Sept. 21, 1916
Trust No. 3
Emily de La Grange
48
April 24, 1917
Trust No. 2
Amicie de La Grange
21
April 24, 1917
Trust No. 6
Amicie de La Grange
21
Dec. 21, 1920
Trust No. 4
Anne de La Grange
19
Nov. 29, 1918
Trust No. 7
Anne de La Grange
19
Dec. 21, 1920
Trust No. 5
Emilie de La Grange
18
July 17, 1919
Trust No. 8
Emilie de La Grange
18
Dec. 21, 1920
Trust No. 10
Henry de La Grange
13
June 9, 1924
Decedent's daughters, Jessie and Emily were adults and were, respectively, 38 and 27 years of age when the trusts were created for their benefit. The terms of the trusts for their benefit (Nos. 9 and 3) are identical except for differences *347 in the names of persons named to succeed to the interests in the trust estates. Under the terms of each trust, the trustees were to apply the net income to the use of Jessie, for life, under her trust, and to the use of Emily, for life, under her trust. Upon the death of Jessie (Trust No. 9), the trust corpus is to be divided into equal shares so as to make one share for each child of Jessie surviving her, and one share for the living issue, taken collectively, of each child of Jessie then deceased. Any share set aside for the issue of a deceased child is to be paid to such issue. Any share set aside for Diana Dodge Ryan, Jessie's daughter, is to be held in further trust to pay the net income to Diana during her life, and upon her death, the principal is to be paid to her issue then living; or if none, then to the issue of Jessie then living; or if none, to Emily de La Grange, if living; or, if not living, to the living issue of Emily; or if none, then to the decedent. Henry T. Sloane, if living; or if he should not be living, then to the next of kin of Henry T. Sloane. Any share which could be set apart for a child of Jessie, other than Diana Dodge Ryan, was to be held upon other *348 trusts, which are not material because Diana was the only child of Jessie living at the time of decedent's death. In case Jessie died leaving no issue her surviving (1) if Emily were then living the principal was to be held in further trust to pay the net income to Emily during her life; and (2) at the death of the survivor of Jessie and Emily, the principal of the trust was to be paid to the issue of Emily then living, or if none to the decedent if living, or if he were not then living, to his next of kin. Upon the death of Emily de La Grange (Trust No. 3), the principal of the trust was to be divided and held in trust or paid in the same manner as in the trust for Jessie, as stated above, substituting the name of Amicie for the name of Diana, and the name of her mother, Emily, for the name of Jessie. A different provision was made in the succession after reaching the issue of Emily. If none of her issue survived her, one-fifth of the principal was to be paid to Amaury de La Grange, if living and if he had been Emily's husband at the time of her death; and four-fifths of the principal was to be paid to the decedent, Henry T. Sloane, (or the whole upon failure of Amaury to take) *349 if living, or to his next of kin. Also, any share so set apart for a child of Emily other than Amicie was to be held in trust to pay the income to such child until the death of Amicie or of such child, whichever should first occur. If such child survived Amicie, then on Amicie's death the principal of such share was to be paid to such child. If such child predeceased Amicie, then on the death of such child the principal of such share was to be paid to the issue of such child, or, if none to the issue of Emily then living, or in default of such issue to pay one-fifth of the principal of such share to Amaury, subject to the conditions above described, and the other four-fifths (or, if said conditions were not met, the whole) of the principal of such share to the decedent if living, or, if he were not then living, to his next of kin. In case Amicie predeceased her mother Emily, then in place of Amicie's life there was to be substituted the life of the first-mentioned of such of the following persons as should survive Emily: Diana Dodge Ryan, Margaret Sloane Patterson, Elizabeth de Rham Leonard, Cornelius S. Lee, Jr. If neither Amicie nor any of the four persons just mentioned survived *350 Emily, then on Emily's death the share of the principal which otherwise would have been held in trust for a child of Emily (other than Amicie) was to be paid outright to such child. In case Emily died leaving no issue her surviving, the principal of the trust was to be paid one-fifth to Amaury, subject to the conditions above described, and four-fifths (or, if said conditions were not met, the whole) to the decedent if living, or, if he were not then living, to his next of kin. Contingent measuring lives under trusts for Jessie and Emily, the date of birth, and the age on the date of decedent's death, nearest birthday, are as follows: Age on
Name
Date of Birth
9/18/37
Margaret Patterson
June 28, 1910
27
Elizabeth Leonard
Aug. 18, 1912
25
Cornelius Lee, Jr.
Feb. 1, 1904
34
The beneficial interests created by the trust for the benefit of Diana Dodge Ryan (Trust No. 1) were as follows: The net income of the trust was to be paid to Diana Dodge Ryan during her life. At her death, if issue of hers survived her, the principal was to be paid to such issue. In case no such issue survived her, if her mother Jessie were living the net income of the trust was to be paid *351 to Jessie during her life, and at the death of the survivor of Diana Dodge Ryan and Jessie the principal was to be paid to the decedent if then living, or, if he were not living, to his next of kin. The beneficial interests created by the trust for the benefit of Henry de La Grange were as follows: The net income of the trust was to be accumulated until Henry's twenty-first birthday (May 25, 1945), subject to the trustees' power to apply the accumulated income to Henry's maintenance, education or support. In case Henry should die before May 25, 1945, the accumulated income was to be paid to his issue him surviving, or if none to his mother Emily if living, or if Emily were not then living to her issue then living, or in default of such issue to the decedent if living, or if he were not then living, to his next of kin. On May 25, 1945. if Henry were living the accumulated income was to be paid to him, and thereafter the net income of the trust was to be paid to him during his life. At Henry's death, if he left issue him surviving, the principal of the trust was to be paid to such issue. In case no such issue survived him, if his mother Emily survived him, the net income of the trust *352 was to be paid to Emily during her life, and at the death of the survivor of Henry and Emily the principal of the trust was to be paid to the issue of Emily then living, or in default of such issue to the decedent if living, or, if he were not then living, to his next of kin. The beneficial interests under the two trusts created for Amicie (Nos. 2 and 6) and the two trusts created for Anne (Nos. 4 and 7) and the two trusts for Emilie (Nos. 5 and 8) are substantially the same, except for variations in the names of remaindermen, as under the trust for Henry de La Grange, as set forth above. The trusts all provided that the net income was to be accumulated during the minority of the first named beneficiary. If said beneficiary died and was survived by the decedent only the total accumulations would revert to the decedent. With respect to the principal of each trust, if the first named remaindermen died and were survived only by the decedent, the principal would revert to the decedent. As of September 18, 1937, and considering only persons in being on that date, no portion of the principal of any of the trusts could become payable to the decedent unless the following persons, whose *353 ages on that date have been set forth above, or survivors of them among the group, should die before the decedent: Jessie Widener, Diana Dodge Ryan, Emily de La Grange, and her children Amicie, Anne, Emilie, Henry, and Diana and Alexandra Davies, great grandchildren of the decedent. In each trust there was accrued income at the date of the death of the decedent, and there was accrued income one year thereafter, on September 18, 1938. The parties have stipulated the amounts of the accrued income on September 18, 1937, and on September 18, 1938, and the stipulations are included herein by reference. In the trusts for Jessie, Emily, and Diana Dodge Ryan (Trusts Nos. 1, 3, and 9), the only person interested in the accrued income was the named beneficiary of the trust, who in each instance, was the life beneficiary of the trust, and the accrued income account represented all the accrued income. In all of the other trusts more than one person had an interest in the accumulated income and two accounts were carried for accrued income, namely, the primary account and the accumulations account. On September 18, 1938, Amicie had become of age, and entitled to the accumulated income of both *354 of her trusts (Nos. 2 and 6); i.e., income on hand or accumulated to September 18, 1937, and neither the decedent nor any other person had any interest in such accumulated income. The parties have stipulated the values of the assets of each trust, exclusive of accrued income, as of the two dates September 18, 1937, and September 18, 1938, and the stipulations are incorporated herein by reference. In the estate tax return, the petitioners reported that all of the trusts were in existence at the time of the decedent's death, and they claimed that none of the transfers to the trustees were subject to estate tax. The respondent, in his notice of deficiency, determined that the decedent's transfers to the trustees were intended to take effect in possession or enjoyment at his death, within the meaning of Section 302 (c) of the Revenue Act of 1926, as amended; and he included in the gross estate the value, as of September 18, 1938, of all assets held by the trustees of the several trusts at the time of the decedent's death, together with all income accrued on said assets to the date of decedent's death. The assets of certain trusts, exclusive of accrued income (Nos. 6, 7, 8, 9, and 10), *355 included shares of stock of W. & J. Sloane, prior preferred and preferred. The fair market values of these stocks on the two dates were as follows: Sept. 18,
Sept. 18,
Class of Stock
1937
1938
-per share-
W. & J. Sloane - prior pfd. $36 $30
W. & J. Sloane - preferred
8
5
Opinion In each of the indentures creating ten inter vivos trusts, there is express provision for reverter to the grantor of the corpus, contingent upon his surviving his daughters and grandchildren and others; and in seven of the trusts there is express provision for payment to the grantor of income accumulated during the minority of the income beneficiary, contingent upon his surviving certain persons. Three of the trusts provide for the present enjoyment of income by the income beneficiary. In determining the deficiency, respondent included in the gross estate the entire value of all of the trusts. Respondent, on brief, now takes the position that in the case of the three trusts (Nos. 1, 3, and 9), where the outstanding life interests in trust income were in enjoyment, there should be excluded from the gross estate the actuarial value of the equitable life estates. He takes *356 this view under his ruling, T.D. 5008, C.B. 1940 - 2, p. 286, which amended article 17 of Regulations 80 (1937 ed.). He contends that the value of the property in the ten trusts should be included in the gross estate to the extent that such interests were defeasible during the decedent's lifetime. He contends that the gross estate should not be diminished by any value actuarially calculated for the accumulations of income in the seven trusts; and we understand this contention to mean that the entire value of the seven trusts should be included in the gross estate. Petitioners contend that respondent should have included in the gross estate only the value of decedent's possibility of reverter in each of the ten trusts, if anything at all is to be included. Petitioners contend, first, that nothing should be included in the gross estate on account of the transfers to the trusts because the possibility of reverter to the grantor was remote. In the event that contention is rejected, petitioners have introduced in evidence the actuarial value per dollar of the interest of the decedent in the principal of all of the trusts and in the accumulated income of *357 seven trusts, as computed by an actuary. These values were computed as of the date of decedent's death, September 18, 1937, and they were no greater one year later, on September 18, 1938. The actuarial value per dollar of principal and of accumulated income of the interest of the decedent in each trust, as computed by petitioners, is as follows: Value per $ of
Value per $ Accumulated
Trust
of Principal
Income
No. 1
$0.00000046785 $
No. 2
0.000000004514870646
0.0000000000000097
No. 3
0.0000000186
No. 4
0.00000000452568
0.0000000000345
No. 5
0.0000000054646
0.000000023718
No. 6
0.0000000373893000646
0.0000000000000097
No. 7
0.0000000375730
0.0000000000345
No. 8
0.0000000376856
0.00000000023718
No. 9
0.0000000000000546
No. 10
0.00000000500409
0.00000000282353
Petitioners, on brief, evade taking a direct position on the primary question which is whether or not, under the rule of Helvering v. Hallock, 309 U.S. 106, and Klein v. United States, 283 U.S. 231, the decedent transferred interests in property "intended to take effect in possession or enjoyment at or after his death" within *358 the terms of section 302 (c) of the Revenue Act of 1926, as amended. That question must be determined before going to the question of what value is to be included in the gross estate. The interest of the decedent in the property he transferred to the trusts was remote because contingent upon his surviving two daughters, five grandchildren, and two great grandchildren, whose ages ranged from 4 years to 54 years at the date of the decedent's death. However, the contingent interest which the decedent retains was under express provisions under each trust. It has been held that the degree of remoteness is not determinative. See, Estate of John E. Cain, Sr., 43 B.T.A. 1133, 1139, and cases cited therein; Estate of Benjamin L. Allen, 3 T.C. 844; and Commissioner v. Washer, 127 Fed. (2d) 446, 449, where the court said: It is idle to differentiate the present case from Helvering v. Hallock, supra, upon the ground that the contingencies here involved, unlike those in the Hallock case, are extremely remote. The court was in search of a guiding principle *359 depending not upon illusive and subtle distinctions, but one which should be uniform and workable in the application of the estate tax. Estate of Charles Delany, 1 T.C. 781, is not in point because, as was pointed out at p. 788 of the report, none of the trusts involved "contained any provision whereby the corpus, or any incident of legal ownership therein, would revert to the grantor." Also, we are not concerned here with trusts where there is no contingent reverter to the grantor but only the granting of contingent remainders to the grantor's next of kin. Cf. Commissioner v. Kellogg, 119 Fed. (2d) 54; Estate of Edward E. Bradley, 1 T.C. 518, 522; Estate of Charles Delany, supra;Estate of Flora W. Lasker, 47 B.T.A. 172. It is held that the transfers of the ten trusts are to be included in the gross estate under section 302 (c), under the rule of the Hallock and Klein cases. If decedent had survived the named beneficiaries he would have been repossessed of his property; the interests of others were freed of this contingency *360 by the prior death of the decedent. The next question relates to the measure of the estate tax liability. To what extent is the value of the property which the decedent conveyed inter vivos to the trusts includible in the gross estate? We shall consider this question first without reference to any life estates. Petitioners contend that only the value of the decedent's possibility of reverter in each of the trusts should be included in the gross estate. We rejected such view in Estate of Lester Field, 2 T.C. 21, 23, upon authority of Smith v. Shaughnessy, 318 U.S. 176. See also, Martha E. Gaston Estate, 2 T.C. 672, and Fidelity-Philadelphia Trust Co. v. Rothensies, 112 Fed. (2d) 758. Accordingly, it is held that the full value of the trust property at the time of the decedent's death should be included in the gross estate. In seven trusts, the trustees held accumulations of income at the date of death. The first takers under these trusts were minors whose right to receive the trust income was postponed until they should attain their majority. They were *361 all minors at the date of death. Their respective rights to receive the accumulations, at the time of reaching majority, were conditioned upon survivorship. The decedent retained an express reversionary interest in the accumulations. Petitioners contend that the accumulations are to be included in the gross estate only to the extent of the value of the decedent's possibility of reverter, computed actuarially. This contention is rejected. Estate of Lester Field, supra.It is held that the full value of the accumulations at the date of death should be included in the gross estate. By his death, decedent's retained interest in the accumulations under each of the seven trusts was cut off. The next question relates to the existence of life estates at the date of death. Respondent takes the position that the first takers under the seven trusts had only future interests in the trust income. United States v. Pelzer, 312 U.S. 399. We must agree with respondent. There is no evidence that the trustees, under discretion given them, were paying to or using for the infant beneficiaries any of the trust income during the existence *362 of the trust prior to the date of death. Under three of the trusts, Nos. 1, 3, and 9, there were life estates outstanding at the date of death. Respondent concedes that the actuarial value of each life estate under these trusts is not to be included in the value of the gross estate and is to be deducted from the value of the corpus. See Estate of Peter D. Middlekauff, 2 T.C. 203Central National Bank of Cleveland v. United States, 41 Fed. Supp. 239. The income accrued and payable to the life beneficiaries under the three trusts should not be included in the gross estate since the life estates themselves are excluded. The accrued income which was to be accumulated should be included in the gross estate for the same reasons that the accumulations are to be included. The parties have stipulated the values on the respective dates of September 18, 1937, and September 18, 1938, of all assets of the trusts except the W. & J. Sloane preferred and prior preferred stocks held by the trusts. Under Part I, we have rejected the maximum authorized bid prices at the auction sale as determinative of the fair market value of the preferred *363 and prior preferred stocks of W. & J. Sloane, and we reject them under this issue. Petitioners presented the testimony of their two experts, Coffman and Wiese, on their respective opinions of the fair market values of these stocks on September 18, 1937, and September 18, 1938. Their opinions of the respective values were as follows: Coffman
Weise
9/18/37
9/18/38
9/18/37
9/18/38
W. & J. Sloane - preferred, per sh
$ 8.00
$ 5.00
$ 9.50
$15.00
W. & J. Sloane - prior pfd. per sh
31.00
26.00
42.00
29.00
We have determined, and found as a fact, upon all of the evidence that the fair market value of the preferred stock was $8 per share on September 18, 1937, and $5 per share on September 18, 1938; and that the fair market value of the prior preferred stock on those dates was $36 and $30, respectively. With respect to the value of the preferred and the prior preferred stock, we find the value to be no greater on September 18, 1938, than on September 8, 1938. (See fair market values determined for September 8, 1938, under Part I. The above values are, in our opinion, the lowest amounts that a willing buyer and a willing seller would agree upon as a fair price *364 on the respective dates. III. Miscellaneous Issues A. Accrued Interest and Dividends Findings of Fact Among the assets included in the gross estate were certain interest bearing bonds and dividend paying stocks, a description of which is unnecessary. The accrued income thereon at the date of death was $28,191.06, and on the optional date the accrued income was $21,073.12. Also, among the assets included in the gross estate were certain interest-bearing mortgages and notes, C 1 to C 30, inclusive. The accrued income on the notes and mortgages on the date of death and on the optional valuation date, respectively, was $1,877.03 and $1,848.02. The parties are in agreement with respect to the above amounts. Opinion Petitioners have elected to value the estate under the optional valuation date method. A minor question presented is whether there should be included in the gross estate $30,068.09, the amount of interest and dividends which had accrued but had not been received at the date of death, as respondent contends, or, $22,921.14, the amount which had accrued but had not been received at the optional valuation dates, as petitioners contend. Respondent's view is taken under *365 his ruling T.D. 5047, approved May 22, 1941, C.B. 1941 - 1, p. 425. The ruling amends articles 11 and 13 of Regulations 80, (1937 ed.) as amended by earlier rulings. Also, the ruling was issued after the decision of the Supreme Court in Maass v. Higgins, 312 U.S. 443. We considered the same question in Estate of George R. Nutter, 46 B.T.A. 35, 38; aff'd, sub nom. McClennen, Executors v. Commissioner, 131 Fed. (2d) 165, 170. We considered the Maass case, and, under its authority, sustained respondent's view. We do likewise here, and hold that only the amount of $30,068.09, accrued but not received at the date of death, should be included in the gross estate under the optional valuation method, and not $22,921.14, accrued but not received as of the subsequent optional valuation dates. We so hold under the limited facts presented. Respondent's contention here is in harmony with the result reached in the Maass case. There has not been included in the $30,068.09 any interest or dividends which accrued after the date of the decedent's death. Here, the *366 above amount of interest and dividends accrued during the period before death. We think they must be included in the gross estate. In the Maass case, the executor availed himself of the optional valuation date method of valuing the estate. The Supreme Court opinion states that, "In the appraisal of the decedent's estate, rent or interest accrued to the date of death is properly treated as a capital asset". The accruals of income to the date of death, under respondent's contention, are here treated as a capital asset. The accruals are to be paid in cash. The value of the accruals, $30,068.09, became fixed at the date of death. The optional valuation dates cannot have any bearing upon or relation to the amount of the accruals to be included in the gross estate. As long as the decedent lived he had a right to the accruals of interest and dividends, which was a property right. Death ended that interest of the decedent. The date of death fixes the amounts of the accruals which became a capital asset at the death of the decedent. Petitioners present no argument to sustain their position but rely solely on the Maass case. In our opinion that case is not authority for fixing the *367 amount of the accruals at a date subsequent to the date of death, which is, in substance, what petitioners seek to do. B. Additional Deductions Findings of Fact Petitioners have paid a total of $6,416.72 for administration expenses and claims against the estate, in addition to those claimed as deductions for expenses paid in the return. Opinion Petitioners included in deductions from the gross estate in the estate tax return $55,000, as "estimated" attorneys' fees, all of which was allowed by the Commissioner. Between September 29, 1939, and October 28, 1942, $51,000 attorneys' fees was paid. The evidence does not show whether the $51,000 was in addition to the $55,000 which has been allowed. This item may be adjusted under Rule 50 under stipulation of the parties. The petitioners deducted on the estate tax return $74,167.51 as "estimated" executors' commissions. The Commissioner allowed as deductions for such commissions $75,118.07, the amount stated in an affidavit filed October 10, 1940, by one of the petitioners. On September 29, 1940, petitioners paid commissions totaling $40,000. The evidence does not show whether the $40,000 is part of the $75,118.07 which has been *368 allowed. The matter may be adjusted under Rule 50 under stipulation of the parties. The respondent agrees that petitioners are entitled to an additional deduction of $6,416.72 for administrative expenses which have been paid. At the time of the hearing petitioners were unable to estimate the additional amounts of deductible expenses which would be paid by the executors. Further adjustments may be made under Rule 50 under stipulation of the parties. C. Credit for State Estate Taxes Petitioners claim and respondent agrees that petitioners are entitled to credit against the estate tax for inheritance taxes paid to the states of New York and Florida in the amount of $345,836.89. D. Credit for Federal Estate Tax Petitioners paid $861,081.94 on December 17, 1938, as the tax reported on their return for the estate, and received from the collector a receipt for said payment. On October 21, 1940, petitioners paid $284,110.81, additional, on the estate tax, and $31,392.30, as "interest". Receipt for these payments was obtained by petitioners. Petitioners have paid a total of $1,176,585.05. The deficiency notice, dated May 28, 1941, states that the deficiency in estate tax is *369 $3,007,098.15. The statement attached shows computation of total net tax of $3,868,180.09, less tax shown on return $861,081.94, leaving a deficiency of $3,007,098.15. Thus, respondent disregarded the receipt of any amount in excess of the tax shown on the estate tax return, although the payment made on October 21, 1940 in the total amount of $315,503.11 was not returned to petitioners. Respondent does not deny that all payments said to have been paid have been paid. The conclusions reached under some of the issues sustain respondent's contentions with respect to the law to be applied. The determinations made under Part I result in higher values for certain securities than were reported in the tax return. The parties have agreed to the values of other properties and securities under stipulations which have been filed. A recomputation of the estate tax must be made under Rule 50 of the Court's Rules of Practice. Under the circumstances, the respondent's original determination of the deficiency under his final letter of May 28, 1941, is subject to revision. The fact that respondent originally determined the deficiency to be $3,007,098.15, without giving effect to the payments made *370 on October 21, 1940, need not be discussed. However, when the recomputation is made under Rule 50, effect should be given to the total payment made after the return was filed. We think the entire sum of $315,503.11, must be treated as a payment on account of the total estate tax due. See Estate of Genevieve Brady Macaulay, 3 T.C. 350. As we said there, "the only fair inference to be drawn from the evidence is that the entire sum paid was paid in respect of the estate tax for which petitioners were then liable." Hence, if there is a deficiency, it will be in an amount by which the amount of the recomputed tax exceeds the total of the sums which petitioners have paid, namely, $1,176.585.05. See, also, section 307 of the Revenue Act of 1926 which provides, in part, that the amount shown as the tax upon the return shall be increased by amounts collected without assessment. Decision will be entered under Rule 50 Footnotes
*. Pursuant to Tax Court order of May 15, 1944, this opinion has been recalled for further consideration, and pursuant to further order of May 30, 1944, the Findings of Fact and Opinion have been vacated. - CCH.↩
*. The amounts per share represent the gross auction sale price per share. ↩
**. The total values reported represent the total net sales prices after deducting expenses.↩
*. The numbers given to the trusts are the numbers they bear as Exhibits.↩